1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nathan R. Ring
Nevada State Bar No. 12078
**STRANCH, JENNINGS & GARVEY, PLLC**
3100 W. Charleston Boulevard, Suite 208
Las Vegas, NV 89102
Telephone: (725) 235-9750
lasvegas@stranchlaw.com

Roberta D. Liebenberg (*pro hac vice* forthcoming)
**FINE, KAPLAN and BLACK, R.P.C.**
One South Broad St.
23rd Floor
Philadelphia, PA 19107
Telephone: 215-567-6565
rliebenberg@finekaplan.com

*Counsel for Plaintiffs and the Proposed Class*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| MICHELE CARINO, individually and as parent and natural guardian of W.W., a minor, and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | |
| NORTHWELL HEALTH, INC. and PERRY JOHNSON & ASSOCIATES, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Michele Carino, individually and as parent and natural guardian of W.W., a minor, and on behalf of all similarly situated persons, alleges the following against Northwell Health, Inc. ("Northwell") and Perry Johnson & Associates, Inc. ("PJ&A") (collectively, "Defendants"), upon personal knowledge as to her own actions, and, *inter alia*, her counsels' investigation, and upon information and belief as to all other matters:

## I.    NATURE OF THE ACTION

1.      This class action arises out of a targeted cyberattack and data breach that occurred between around March 27, 2023 and May 2, 2023 ("Data Breach") resulting from Defendants' failure to implement reasonable and industry standard data security practices to safeguard the personally identifying information ("PII") and personal health information ("PHI") of millions of individuals.

2.      Northwell describes itself as New York State's largest health system, seeing more than 2 million patients per year and having 900 hospitals and care centers and more than 85,000 employees.[1] In the course of providing healthcare services, Northwell collected and maintained the PII and PHI of W.W., Ms. Carino, and the other members of the proposed Class (defined in the Class Definition section, *infra*).

3.      PJ&A is a health information technology company that provides "customized transcription solutions" and other services to medical professionals.[2] It provides certain transcription and dictation services to Northwell and its subsidiaries and affiliates and in the course of those services receives personal health information regarding Northwell patients.

4.      PJ&A recently disclosed that "[a]n unauthorized party gained access to the PJ&A network between March 27, 2023, and May 2, 2023, and during that time, acquired copies of certain files from PJ&A systems."[3] The files contained PII and PHI (together, "Private

---

[1] https://northwell.edu/about-northwell (last visited Nov. 28, 2023).

[2] https://www.pjats.com/about-pja/ and https://www.pjats.com/portfolio/medical-transcription/ (last visited Nov. 26, 2023).

[3] PJ&A Cyber Incident Notice, retrieved from https://www.pjats.com/downloads/Notice.pdf on Nov. 26, 2023 and attached hereto as Exhibit A.

Information") of W.W. and other current and former patients of Northwell and of other medical providers.

5.      Defendants Northwell and PJ&A owed a duty to W.W. and his mother ("Plaintiffs") and to the other Class Members to protect the Private Information entrusted to Northwell on the mutual understanding that Northwell and its vendors and business associates would implement and maintain reasonable and adequate security measures to secure, protect, and safeguard sensitive personal information against unauthorized access and disclosure. Defendants breached that duty by failing to implement and maintain reasonable and adequate security measures, thereby allowing unauthorized access to and disclosure of Plaintiffs' and Class Members' personal information.

6.      PJ&A disclosed that the Private Information compromised in the Data Breach includes names, Social Security numbers, dates of birth, addresses, insurance information, medical record numbers,  hospital account numbers, and clinical information such as the names of the facilities at which patients were treated, names of the patients' healthcare providers, admission diagnoses, and dates and times of service,[4] which is Protected Health Information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health ("HITECH") Act (hereinafter, "HIPAA"). Given the nature and extent of PJ&A's transcription services for Northwell, the compromised PHI certainly also includes transcripts of operative reports, consult reports, history and physical exams, discharge summaries, progress results, diagnoses, testing results, medical history, family medical history, surgical history, social history, medications, allergies, and other observational information.

_____

[4] Exhibit A, Cyber Incident Notice.

7.    The Data Breach affected more than 8.9 million individuals.[5] Of those, approximately 3.8 million or more are Class Members whose Private Information came from Northwell.[6]

8.    The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patients' Private Information from a foreseeable and preventable cyber-attack.

9.    As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

10.    Armed with the Private Information accessed in the Data Breach, data thieves have already engaged in identity theft and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

11.    Plaintiffs and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

---

[5] Secretary of the U.S. Department of Health and Human Services Office for Civil Rights, Cases Currently Under Investigation, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Nov. 22, 2023).

[6] "According to News12 Long Island, Northwell Health initially released a draft statement indicating 3,891,565 individuals had been affected, although the statement was later recalled and Northwell Health said it was unable to confirm exactly how many individuals had been affected." https://www.hipaajournal.com/northwell-health-pja-data-breach/ (last visited Nov. 22, 2023).

12.    Plaintiffs bring this class action lawsuit on behalf all those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access by an unknown third party or precisely what specific information was disclosed.

13.    Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

14.    Plaintiffs seek remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendants.

## II.    PARTIES

15.    Plaintiff Michele Carino and her son W.W., a minor, are citizens of the State of New York.

16.    W.W. was and is a patient of Northwell. In order for W.W. to obtain healthcare services from Northwell, both Ms. Carino and W.W. were required to provide Private Information to Northwell and, indirectly or directly, to JP&A.

17.    Based on representations made by Northwell, Ms. Carino believed Northwell had implemented and maintained reasonable and adequate security practices to protect her and W.W.'s Private Information, including any of their Private Information that Northwell provided to its vendors and business associates.

18.    At all relevant times, including the time of the Data Breach (between around March 27, 2023 and May 2, 2023) through today, Defendants have retained Plaintiffs' Private Information in their data systems.

19.     Ms. Carino is very careful about sharing her and W.W.'s sensitive Private Information. She stores any documents containing their Private Information in a safe and secure location. Ms. Carino is particularly concerned about unlawful access to and use of W.W.'s Private Information because he is a minor. She would not have entrusted W.W.'s or her Private Information to Northwell had she known that Northwell does not adequately protect the Private Information in its possession, including by contracting with PJ&A or any other vendor that does not adequately protect Private Information.

20.     By letter dated November 3, 2023 (the "Parent Notice Letter"), PJ&A  informed Ms. Carino that her son's Private Information was compromised in the Data Breach, including his name, date of birth, address, medical record number, hospital account number, and "clinical information such as the name of the treatment facility, the name of [his] healthcare providers, admission diagnosis, and date(s) and time(s) of service."[7]

21.     As a result of the Data Breach, and at the direction of the Parent Notice Letter, Ms. Carino made and continues to make reasonable efforts to mitigate the impact of the Data Breach, including by monitoring her bank and payment card accounts, obtaining credit reports, trying to figure out what information of hers and of W.W. was compromised, and researching how to protect her son from identity theft and other harms. Ms. Carino has spent significant time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

22.     Since receiving notice of the Data Breach, Ms. Carino has learned about multiple attempts – at least one of which was successful – to open fraudulent credit card accounts in her

---

[7] A redacted copy of the Parent Notice Letter is attached as Exhibit B.

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

name. She also had to close a legitimate credit card account because of suspected fraud. She reasonably believes this happened because her PII was stolen in the Data Breach.

23.    The Data Breach has caused Plaintiffs actual injury. In addition to the unauthorized charges on her credit card and multiple attempts to use Ms. Carino's PII to fraudulently apply for credit, she and/or W.W. have suffered: (i) a substantial, imminent, and continuing risk of identity theft and medical identity theft; (ii) an increase in spam calls, texts, and/or emails; (iii) lost or diminished value of their Private Information; (iv) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to hours and hours of lost time; (v) invasion of privacy; (vi) loss of benefit of the bargain; (vii) current and ongoing concern that their Private Information has been and will continue to be disseminated on the dark web; (viii) overpayment for services that should have but did not include adequate security for their Private Information; and (ix) the continued and certainly increased risk to their Private Information which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

24.    The Data Breach has caused Plaintiffs to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed them of key details about the Data Breach.

25.    As a result of the Data Breach, Ms. Carino anticipates that both she and W.W. will spend considerable time and money on an ongoing basis to try to mitigate and address harms to them caused by the Data Breach.

26.     Plaintiffs have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

27.     Northwell is a not-for-profit corporation organized under the laws of the state of New York with its principal place of business located at 2000 Marcus Ave., New Hyde Park, NY 11042. It is authorized to do business in Nevada.

28.     PJ&A is a corporation organized under the laws of the state of Nevada with its principal place of business located at 1489 W. Warm Springs Rd., Suite 110, Henderson, NV 89012.

## III.    JURISDICTION AND VENUE

29.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, many of whom reside outside the State of Nevada and who have different citizenship from at least one of the Defendants. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

30.     This Court has personal jurisdiction over Defendant PJ&A because it is domiciled in and operates in Nevada.

31.     The Court has personal jurisdiction over Defendant Northwell because it is authorized to, and does, business in Nevada, including making and performing contracts in Nevada.

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because PJ&A's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendants have harmed Class Members as a result of actions that have occurred in this District.

## IV.    FACTUAL ALLEGATIONS

**A.    *Defendants' Businesses and Promises of Security and the Data Breach***

33.    Northwell provides healthcare and related services to patients in hospitals, outpatient clinics, provider offices, and other locations throughout New York City, Long Island, and Westchester County, New York.[8]

34.    Northwell's website states that Northwell "understands that [patients] may have concerns about privacy" and assures them that patients are its "number one priority" and "patient privacy is an integral part of the health care we provide to you."[9] Northwell further promises that "[t]o ensure the development of a lasting bond of trust with our patients, we have many safeguards to protect the privacy and security of your personal information" and "our employees are educated from the moment they are hired and continually after, to respect and protect our patient's privacy."[10]

35.    Northwell also posts its "Notice of Privacy Practices" in English and Spanish on its website.[11] The Notice "explains how we [Northwell] fulfill our commitment to respect the privacy and confidentiality of your protected health information, as well as the legal obligations we have regarding your protected health information, and about your rights under federal and state laws."[12]

---

[8]    https://northwell.edu/about-northwell/sites/northwell.edu/files/2023-08/We-are-Northwell-Fact%20Sheet-Aug-2023.pdf (last visited Nov. 28, 2023).

[9] *Patient Privacy Overview*, Northwell Health, https://www.northwell.edu/about-northwell/commitment-to-excellence/protecting-patient-privacy (last accessed Nov. 27, 2023).

[10] *Id.*

[11]    Notice of privacy practices, https://www.northwell.edu/about-northwell/commitment-to-excellence/protecting-patient-privacy (last accessed Nov. 27, 2023).

[12] *Id.*

36.    PJ&A is "a business associate" to "multiple covered entities" under HIPAA and admits that the PHI of patients of "covered entities" was compromised and acquired in the Data Breach.[13]

37.    Northwell contracts with PJ&A for medical transcription services.

38.    In the course of the patient-provider relationship, Defendants obtained large amounts of Private Information about Plaintiffs and Class Members, including: names, Social Security numbers, dates of birth, addresses, medical record numbers, hospital account numbers, and extensive diagnosis and treatment information, recorded through PJ&A's medical transcription services.

39.    In the Parent Notice Letter, PJ&A admits that it "became aware of a data security incident impacting [its] systems on May 2, 2023" and "preliminarily determined that Northwell data was impacted on May 22, 2023" but did not notify Northwell that "an unauthorized party had accessed and downloaded certain files from [PJ&A's] system" until July 21, 2023.[14] PJ&A also admits that it "confirmed the scope of the Northwell data impacted" in the Data Breach "by September 28, 2023"[15] and yet it did not notify Ms. Carino about the Data Breach or that W.W.'s Private Information had been compromised until sending her the November 3, 2023 Parent Notice Letter.

40.    Although Northwell has known about the Data Breach since at least July 21, 2023, and knew or should have known by, at the latest, September 28, 2023, that W.W.'s Private Information was "impacted," Northwell still has not directly notified Ms. Carino about the Data

---

[13] Ex. A (Cyber Incident Notice).

[14] Ex. B (Parent Notice Letter).

[15] *Id.*

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

Breach. Upon information and belief, Northwell has not provided individual notice to Class Members affected by the Data Breach, instead merely adding a brief statement about the Data Breach and a link to the PJ&A Cyber Incident Notice to the bottom of the homepage of its website.[16]

41.    Neither the Parent Notice Letter nor the Cyber Incident Notice informs W.W. or his mother which specific Private Information was stolen, provides the root cause of the Data Breach, identifies the vulnerabilities exploited, discusses any measures by Northwell to require and confirm that its vendors and business associates implement and maintain appropriate security measures, or specifies the remedial measures undertaken to ensure such a breach does not occur again. To date, neither Northwell nor PJ&A has provided this information to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

42.    Defendants' failure to promptly notify Plaintiffs and other Class Members of the Data Breach and that their Private Information was stolen prevented them from taking prompt and appropriate action to mitigate their damages and allowed the cyber-thieves to continue to monetize, misuse, or disseminate the Private Information.

43.    Upon information and belief, the cyberattack was targeted at PJ&A due to its status as a healthcare entity business associate that collects, creates, and maintains Private Information on its computer networks and/or systems.

---

[16] The complete statement is: "Our vendor Perry Johnson & Associates (PJ&A) was impacted by a data security incident, which affected certain patients' personal information. If you are a Northwell patient with additional questions after contacting PJ&A, call **(516) 583-8041**." Notices, www.northwell.edu (last visited Nov. 27, 2023).

725-235-9750
lasvegas@stranchlaw.com
www.stranchlaw.com
STRANCH, JENNINGS & GARVEY
PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

44.    Because of this targeted cyberattack, data thieves were able to gain access to and obtain data that included the Private Information of Plaintiffs and Class Members.

45.    Due to the actual and imminent risk of identity theft as a result of the Data Breach, Plaintiffs and Class Members must, as the Parent Notice Letter encourages, monitor their financial accounts for many years to mitigate the risk of identity theft.

46.    The Parent Notice Letter includes an offer of 12 months of credit monitoring services through Equifax. This is wholly inadequate to compensate Plaintiffs and Class Members as it does not address the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and medical and financial fraud and does not provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information.

47.    That Defendants are encouraging victims of the Data Breach to enroll in credit monitoring is an acknowledgment that Plaintiffs and Class Members are subject to a substantial and imminent threat of fraud and identity theft.

48.    Defendants had obligations created by the FTC Act, HIPAA, contract, state and federal law, common law, and industry standards to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

**B.    *Data Breaches Are Preventable***

49.    Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting equipment and computer files containing Private Information.

50.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class

Members, such as encrypting the information or archiving or deleting it when it is no longer needed, thereby causing the exposure of Private Information.

51.    Numerous governmental agencies and private businesses have recommended that businesses in general and healthcare-related entities in particular implement specific measures to prevent and detect cyber-attacks.[17] Both Defendants could and should have implemented such measures.

52.    The fact of the Data Breach indicates that Defendants failed to adequately implement recommended measures to prevent cyberattacks, resulting in the Data Breach and, upon information and belief, the exposure of the Private Information of over 3.89 million Northwell patients, including that of Plaintiffs and Class Members.

**C.    *Defendants Acquire, Collect, And Store Plaintiffs' and Class Members' Private Information.***

53.    Defendants acquire, collect, and store a massive amount of Private Information in the regular course of their businesses.

54.    As a condition of obtaining medical services at Northwell, Northwell requires that patients and others, including parents and guardians of minors, entrust it with highly sensitive personal information. Northwell provides or makes available to every patient its Notice of Privacy Practices (see fn. 11 and accompanying text, *supra*) that explains how it handles patients' sensitive and confidential information and also promises, among other things, to safeguard patients' Private Information.

---

[17] *See, e.g., Ransomware groups continue to target healthcare, critical services; here's how to reduce risk* (Apr 28, 2020), https://www.microsoft.com/en-us/security/blog/2020/04/28/ransomware-groups-continue-to-target-healthcare-critical-services-heres-how-to-reduce-risk/ (last visited Nov. 27, 2023).

725-235-9750
lasvegas@stranchlaw.com

3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

STRANCH, JENNINGS & GARVEY
PLLC

55.     PJ&A's website states that "PJ&A recognizes the importance of information security," and that the "PJ&A platform enables HIPAA compliance through advanced technology for dictation, transcription and patient data accessibility."[18]

56.     By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure.

57.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendants absent a promise to safeguard that information.

58.     Plaintiffs and the Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for proper purposes only, and to make only authorized disclosures of this information.

**D.      *Defendants Knew or Should Have Known of the Risk Because Healthcare Entities in Possession of Private Information Are Particularly Susceptible to Cyber Attacks.***

59.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store Private Information, like Defendants, preceding the date of the breach.

60.     Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread.

---

[18] HIPAA Compliancy, https://www.pjats.com/hipaa-compliancy/ (last accessed Nov. 27, 2023).

61.     There were a record 1,862 publicly reported data breaches in 2021, and almost as many, 1,802, in 2022.[19]

62.     The healthcare industry has been a frequent target of cybercrime, and in light of recent high profile cybersecurity incidents at other healthcare-related entities—including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020)—Defendants knew or should have known that PJ&A's electronic records were likely to be targeted by cybercriminals.

63.     Defendants knew and understood that unprotected or exposed Private Information in the custody of healthcare services entities, like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

64.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if either Defendant's data security system were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

---

[19] *See* 2022 Data Breach Annual Report (ITRC, Jan. 2023), https://notified.idtheftcenter.org/s/, at 2 (last accessed Nov. 27, 2023).

65.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

66.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

67.     The ramifications of Defendants' failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers, birth dates, driver's license numbers, and PHI, all of which were compromised in the Data Breach—fraudulent use of that information and damage to victims may continue for years.

### E.     *Value Of Personally Identifiable Information*

68.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[20] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

69.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.

---

[20] 17 C.F.R. § 248.201 (2013).
[21] *Id.*

70.     Numerous sources cite dark web pricing for stolen identity credentials.[22] For example, Private Information can be sold for up to $200.[23] Criminals can also purchase access to entire data breach sets for $900 to $4,500.[24]

71.     PHI can sell for as much as $363 per record according to the Infosec Institute.[25]

72.     Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

73.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

74.     Many Class Members, including Ms. Carino, used their driver's licenses to verify their identity to Northwell. Driver's license numbers are also incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information. A driver's license

---

[22] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Nov. 27, 2023).
[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Nov. 27, 2023).
[24] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Nov. 28, 2023).
[25] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Nov. 27, 2023).

can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[26]

75.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[27] However, this is not the case. As cybersecurity experts point out[28]:

> It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks.

76.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a 2021 New York Times article.[29]

77.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used.

78.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[30] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen

---

[26]    https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited Nov. 27, 2023).

[27]    https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited Nov. 27, 2023).

[28] *Id.*

[29] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited Nov. 27, 2023).

[30] *Identity Theft and Your Social Security number*, Social Security Administration (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Nov. 27, 2023).

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[31] Each of these fraudulent activities is difficult to detect. An individual may not know that his or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

79.    Moreover, it is not an easy task to change or cancel a stolen Social Security number:

> An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[32]

80.    Social Security numbers, driver's license numbers, and similar PII demand an especially high price on illicit markets, going for more than ten times the price for credit card information.[33]

**F.    Defendants Fail to Comply with FTC Guidelines.**

81.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[31] *Id.*

[32] Brian Naylor, *Victims of Social Security number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Nov. 27, 2023).

[33] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015) (quoting Martin Walter, senior director at cybersecurity firm RedSeal), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Nov. 27, 2023).

82.    In 2016, the FTC updated its publication *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[34]

83.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

84.    The FTC further recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

85.    The FTC has brought enforcement actions against healthcare entities for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"),

---

[34] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf [*sic*] (last visited Nov. 26, 2023).

[35] *Id.*

15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[36]

86.    Defendants failed to properly implement basic data security practices.

87.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

88.    Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of Northwell's patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**G.    _Defendants Fail to Comply with HIPAA Guidelines._**

89.    Northwell is a covered entity under HIPAA, and PJ&A is a covered entity and/or a covered Business Associate under HIPAA (45 C.F.R. § 160.103). Both Defendants are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Privacy of Individually Identifiable Health Information"), and the Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

90.    Both Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[37] _See_ 42 U.S.C. §17921, 45 C.F.R. § 160.103.

---

[36] _See_ Federal Trade Commission, Privacy and Security Enforcement. Press Releases, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement. (last visited Nov. 27, 2023).

[37] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

91.    HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

92.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

93.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

94.    "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

95.    HIPAA's Security Rule (45 C.F.R. § 164.306(a)) requires Defendants to do the following:

a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.    Ensure compliance by their workforces.

96.    HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are

required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

97.    HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

98.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 calendar days after discovery of the breach***."[38]

99.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

100.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

101.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions

---

[38] Breach Notification Rule, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited Nov. 27, 2023).

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[39] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." U.S. Department of Health & Human Services, Guidance on Risk Analysis.[40]

**H.**    ***Defendants Fail to Comply with Industry Standards.***

102.    As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information they collect and maintain.

103.    Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices.

104.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network

[39] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Nov. 27, 2023).

[40] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Nov. 27, 2023).

725-235-9750
lasvegas@stranchlaw.com
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102
STRANCH, JENNINGS & GARVEY
PLLC

ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. The fact of the Data Breach shows that PJ&A failed to follow these cybersecurity best practices, and that Northwell did not properly and timely assess whether PJ&A did so.

105.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

106.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## I.    *Common Injuries & Damages*

107.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) invasion of privacy; and (f) the continued risk to their Private Information, which remains in

the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information. Ms. Carino and other Class Members have experienced an increase in spam calls, emails and text messages since the Data Breach and fraudulent use of their Private Information.

**J.    *The Data Breach Increases Victims' Risk of Identity Theft.***

108.    Plaintiffs and Class Members are at a heightened risk of identity theft for years to come.

109.    The unencrypted Private Information of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

110.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on illicit markets to other criminals who then utilize the information to commit a variety of identity theft related crimes.

111.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime. The richness of the Private Information stolen here, which includes Social Security numbers and birth dates, makes identity theft an especially serious risk for Plaintiffs and Class Members.

**K.    *Loss of Time to Mitigate Risk of Identity Theft and Fraud***

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

112.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft and fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

113.     Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as the Parent Notice Letter encourages, monitor their financial accounts for many years to mitigate the risk of identity theft.

114.     Plaintiff Carino and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as contacting their banks to ensure their financial accounts are secured.

115.     Plaintiff Carino's mitigation efforts are consistent with the steps that the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[41]

---

[41] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Nov. 27, 2023).

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

**I.** ***Diminution in Value of Private Information***

116.    PII and PHI are valuable property.[42] Their value is axiomatic, considering the value of Big Data in corporate America, and the consequences of cyber thefts include heavy prison sentences. The risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

117.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[43]

118.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[44]

119.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[45]

120.    Conversely sensitive PHI can sell for as much as $363 per record on illegitimate markets, according to the Infosec Institute.[46]

_____

[42] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[43] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Nov. 27, 2023).

[44] https://datacoup.com/ (last visited Nov. 27, 2023).

[45] Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Nov. 27, 2023).

[46] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Nov. 27, 2023).

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

121.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Private Information has been lost, thereby causing additional loss of value.

122.    Defendants were, or should have been, fully aware of the unique type and the significant volume of Private Information on Defendants' networks and thus the sizable number of individuals who would be harmed by the exposure of that information.

123.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

**L.    *Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.***

124.    Given the type of targeted attack in this case and the sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims—and that Plaintiffs and Class Members may not be able to detect the fraud for months or years.

125.    Consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

126.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

## V.    CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

128.    Specifically, Plaintiffs propose the following class definition, subject to amendment as appropriate:

> All individuals who reside in the United States whose Private Information was exposed in the Data Breach involving Defendants (the "Class").

129.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

130.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

131.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

132.    <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Upon information and belief, there are in excess of 3 million Northwell patents and others whose Private Information may have been improperly accessed in the Data Breach, and over 8 million victims overall. The Class is

apparently identifiable within Defendants' records, and PJ&A has already identified many Northwell victims (as evidenced by sending them breach notification letters).

133.   <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether Defendants engaged in the conduct alleged herein;

b.   When Defendants learned of the Data Breach;

c.   Whether Defendants' response to the Data Breach was adequate;

d.   Whether PJ&A unlawfully disclosed Plaintiffs' and Class Members' Private Information;

e.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

f.   Whether Defendants owed a duty to Class Members to safeguard their Private Information;

g.   Whether Defendants breached their duties to Class Members to safeguard their Private Information;

h.   Whether unauthorized persons obtained Class Members' Private Information via the Data Breach;

i.   Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

j.   Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

k.      Whether Defendants knew or should have known that PJ&A's data security systems and monitoring processes were deficient;

l.      What damages Plaintiffs and Class Members suffered as a result of Defendants' misconduct;

m.      Whether Defendants' conduct was negligent;

n.      Whether Defendants were unjustly enriched;

o.      Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

p.      Whether Plaintiffs and Class Members are entitled to credit monitoring, identity restoration. and monetary relief; and

q.      Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

134.    Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

135.    Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

136.    Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out

above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

137.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

138.    Class certification is also appropriate. Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate to the Class as a whole.

139.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## VI.    <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I</u>
**Negligence**
***(On Behalf of Plaintiffs and the Class)***

140.    Plaintiffs restate and reallege the facts set forth above as if fully alleged herein.

141.    Defendants collect the Private Information of Northwell's patients, including that of Plaintiffs and Class Members, in the ordinary course of providing their healthcare and medical transcription services.

142.    Plaintiffs and Class Members entrusted Defendants with their Private Information, directly or indirectly, with the understanding that Defendants would safeguard their Private Information.

143.    Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

144.    By assuming the responsibility to collect and store Private Information, and in fact doing so, and sharing it and using it, Defendants had a duty of care to use reasonable means to secure and safeguard their information systems—and Class Members' Private Information held within them—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could detect a breach of PJ&A's security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

145.    Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

146.    Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l).

Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

147.    Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

148.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Northwell, and thereby PJ&A, with their confidential Private Information, a necessary part of being Northwell patients.

149.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

150.    Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiffs or the Class.

151.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

152.    Defendants had and continue to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

153.    Defendants breached their duties, pursuant to the FTC Act, HIPAA, and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to adequately monitor the security of their networks and systems;

c.    Failing to periodically ensure that their vendors and business associates maintained reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.    Failing to detect in a timely manner that Class Members' Private Information had been compromised;

f.    Failing to remove former patients' Private Information that neither laws nor regulations nor best practices required them to retain; and

g.    Failing to timely and adequately notify Class Members about the Data Breach and its scope so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

154.    Defendants violated HIPAA and Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

155.    Plaintiffs and the Class are within the class of persons that the FTC Act and HIPAA were intended to protect.

156. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and HIPAA were intended to guard against.

157. Defendants' violation of Section 5 of the FTC Act and HIPAA constitutes negligence.

158. The FTC has pursued enforcement actions against businesses that failed to employ reasonable data security measures and caused the same harm as that suffered by Plaintiffs and the Class.

159. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

160. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

161. Defendants have full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

162. Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants' systems.

163. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

164.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and remains in, Defendants' possession.

165.    Defendants were in an exclusive position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

166.    Defendants' duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

167.    Defendants have admitted that the Private Information of Plaintiffs and the Class was wrongfully accessed and disclosed to unauthorized persons as a result of the Data Breach.

168.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

169.    There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was accessed and disclosed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

170.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) Private Information being disseminated on the dark web; (ii) Plaintiffs experiencing an increase in spam calls, texts,

and/or emails; (iii) lost or diminished value of their Private Information; (iv) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (v) invasion of privacy; (vi) loss of benefit of the bargain; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

171.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

172.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

173.    Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiffs and Class Members in an unsafe and insecure manner.

174.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT II
### Breach of Implied Contract
### *(On Behalf of Plaintiffs and the Class against Northwell)*

175.    Plaintiffs restate and reallege the facts set forth above as if fully set forth herein.

176.    Plaintiffs and Class Members were required to provide their Private Information

to Northwell as a condition of receiving healthcare services from Northwell.

177.    Plaintiffs and the Class entrusted their Private Information to Northwell. In so doing, Plaintiffs and the Class entered into implied contracts with Northwell by which it agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

178.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Northwell's data security practices and that of its vendors and business associates who had access to Private Information complied with relevant laws and regulations and were consistent with industry standards.

179.    Implicit in the agreement between Plaintiffs and Class Members and Northwell to provide Private Information was the latter's obligation to take reasonable measures to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, including by its vendors and business associates, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

180.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Northwell, on the other, is demonstrated by their conduct and course of dealing.

181.    Northwell solicited, offered, and invited Plaintiffs and Class Members to provide their Private Information as part of Northwell's regular business practices. Plaintiffs and Class Members accepted Northwell's offers and provided their Private Information to

Defendants.

182.    In accepting the Private Information of Plaintiffs and Class Members, Northwell understood and agreed that it was required to reasonably safeguard the Private Information from unauthorized access or disclosure, including unauthorized access or disclosure by a vendor or business associate.

183.    Northwell promulgated, adopted, and implemented written privacy policies that expressly promised Northwell would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

184.    Northwell further promised to comply with applicable laws and regulations and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

185.    Plaintiffs and Class Members paid money to Northwell and provided their Private Information to Defendants with the reasonable belief and expectation that Northwell would use part of their earnings to obtain adequate data security. Northwell failed to do so.

186.    Plaintiffs and Class Members would not have entrusted their Private Information to Northwell in the absence of the implied contract between them and Northwell to keep their information reasonably secure.

187.    Plaintiffs and Class Members would not have entrusted their Private Information to Northwell in the absence of its implied promise to monitor its computer systems and networks and ensure that it employed reasonable data security measures, and to contract only with vendors and business affiliates who did the same.

188.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contract with Northwell.

189.    Northwell breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, and by failing to provide accurate

notice to them that Private Information was compromised as a result of the Data Breach.

190.    As a direct and proximate result of Northwell's breach of the implied contracts, Plaintiffs and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

191.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

192.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Northwell to, among other things, strengthen its practices and procedures, including with regard to its contracts with vendors and business affiliates, and immediately provide adequate credit monitoring to all Class Members whose data came from Northwell.

## COUNT III
### Unjust Enrichment
### In the alternative
### *(On Behalf of Plaintiffs and the Class)*

193.    Plaintiffs restate and reallege the facts set forth above as if fully alleged herein.

194.    Plaintiffs and Class Members conferred a monetary benefit on Defendants. Specifically, they paid for services from Northwell and in so doing also provided Northwell with their Private Information. Northwell used the monies to pay for PJ&A's services. In exchange, Plaintiffs and Class Members should have received from both Defendants the services that were the subject of the transactions and should have had their Private Information protected with adequate data security.

195.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and have accepted and retained that benefit by accepting and retaining the monies paid to them and the Private Information entrusted to them. Defendants profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

196.    Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or other Class Members for the value that their Private Information provided.

197.    Plaintiffs and Class Members have no adequate remedy at law.

198.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

199.    Plaintiffs and Class Members are entitled to restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

200.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in the alternative to their breach of implied contract claim.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendants and ask the Court:

1.    For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

2.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

3.     For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment.

4.     For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

5.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

6.     For prejudgment interest on all amounts awarded; and

7.     For such other and further relief as this Court may deem just and proper.

## VIII.    **DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury on all

issues so triable.

DATED:  December 19, 2023                    Respectfully submitted,

_/s/ Nathan R. Ring_
Nathan R. Ring
Nevada State Bar No. 12078
**STRANCH, JENNINGS & GARVEY, LLC**
2100 W. Charleston Boulevard, Suite 208
Las Vegas, NV 89102

Roberta D. Liebenberg (motion for admission
_pro hac vice_ forthcoming)
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street
23rd Floor
Philadelphia, PA 19107
Telephone: 215-567-6565
rliebenberg@finekaplan.com